## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

**BREANDEN BENESCHOTT**

      **Plaintiff,**

**v.**                                                   **CASE NO.: 2:19-cv-662-FtM-29NPM**

**TASO DU VAL, an individual, and**
**TOPTAL LLC, a Delaware Limited Liability**
**Company**

      **Defendants.**
_____/

### DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES
### AND COUNTERCLAIMS

COME NOW, Defendants TASO DU VAL and TOPTAL LLC ("Defendants") herein, by and through their undersigned counsel, despite Plaintiff's failure throughout the Complaint to comply with the requirement of Rule 8 of the Federal Rules of Civil Procedure to set forth a short and plain statement of his claims, and answer the Complaint herein, paragraph by paragraph, as follows:

### NATURE OF THE ACTION

1.      Defendants admit that Beneschott's at-will employment was terminated by Toptal on November 12, 2018. Answering further, Defendants admit Beneschott may have been unsatisfied with his deal with Toptal LLC as a mere at-will employee with no equity stake but Defendants deny that Beneschott is entitled to claim that his deal with Toptal was something other than what it was merely because, with the benefit of hindsight and Toptal's success, he came not to like it. Indeed, as COO, Plaintiff understood the nature of his employment and compensation relationship with Toptal. Defendants are without sufficient information to admit or deny whether

Plaintiff believed Defendant Du Val to be his friend, and, to the extent such allegation depends upon the state of mind of Beneschott, Defendants are without knowledge or information sufficient to admit or deny such allegations and therefore deny the allegations in the first sentence of this paragraph.  Defendants deny Plaintiff's allegation he was promised he would receive annual compensation in an amount equal to that paid to Du Val and deny Plaintiff was granted any ownership stake in Toptal LLC.  Defendants admit that for a certain period of time while employed by Toptal LLC, Plaintiff held the title of Chief Operating Officer. Defendants also admit that Plaintiff brought to Defendants' attention that he was involved in a contested paternity suit and child custody battle for his minor daughter pending in the Circuit Court in and for Lee County, Florida, styled *Senick v. Beneschott*, Case No. 17-DR-0559.  Plaintiff expressed concerns to Defendants that the mother of his daughter was trying to position him as a tech multi-millionaire and was using Plaintiff's self-aggrandizing media coverage and social media presence to his disadvantage.  Accordingly, Plaintiff had his personal attorneys contact Toptal because Plaintiff and his attorneys were at pains to counter the mother's portrayal of Plaintiff and wanted to substantiate that, despite colloquial references to him as a "co-founder," he was merely a salaried, at-will employee of Toptal with no equity stake in Toptal LLC.  At Plaintiff's request, not that of Toptal or any of its executives, Toptal's outside law firm provided a letter to Plaintiff's personal attorney, dated September 17, 2018, stating "Mr. Beneschott is an employee of Toptal, LLC, which is a privately-held, single member LLC.  Mr. Beneschott is not a member, shareholder, or owner of the company." To assist with the preparation of such letter, on August 3, 2018, Plaintiff's counsel in his paternity suit and custody battle provided to Defendants excerpts of Plaintiff's sworn testimony before the Lee County Circuit Court to substantiate Plaintiff's understanding that he had no equity interest in Toptal, LLC.  Plaintiff testified as follows:

Q:  What is the structure of the company?  Is it a corporation?

A:  It's a single-member LLC, of which I am not the single member.

Q:  Okay.  And so you're a shareholder?

A:  Technically no.

…

Q:  Who is the single member?

A:  Taso Du Val.

…

Q:  At this moment, you don't actually own 17 percent of this company, it's owned by one person?

A: That's correct.

Q: Who's not you?

A: Correct.

(Testimony of Breanden Beneschott given before the Lee County Circuit Court in the case styled *Senick v. Beneschott*, Case No. 17-DR-0559).  Except as specifically admitted herein, the remaining averments of this paragraph are denied.

2.    Defendants admit that over the course of 2017 and 2018, Plaintiff attempted to recruit and enlist Toptal employees and others in efforts to marginalize, undermine the authority of, and, ultimately, oust Du Val as CEO of Toptal. For instance, Plaintiff informed the Company's new Vice President of People, even before she joined Toptal on October 29, 2018, that:  (i) he felt there needed to be a change at the top at Toptal; (ii) it would, in his opinion, be in the Company's best interests if Du Val left Toptal; (iii) there was a group of executives who agreed with Plaintiff and had tried to force the issue at the Company's recent executive offsite meeting in Cancun,

Mexico in late April/early May 2018; and (iv) Plaintiff hoped and expected that she, as the incoming VP of People, could facilitate the process of removing Du Val from his position as CEO. Otherwise, Plaintiff informed the new VP of People, he would be left with no choice but to leave Toptal. Plaintiff's open animosity and contempt for Toptal's CEO were noted in rambling and disturbing peer performance reviews submitted in October 2018, which revealed more about Beneschott than those he was reviewing, in which he rated the CEO and the other executives who Beneschott perceived were not sufficiently receptive of his mutinous overtures, with scores in multiple categories that Toptal only reserves for people who should be terminated. In whole or large part, this contempt appeared to stem from Beneschott's resentment and frustration that he had not negotiated a better deal with Toptal than his role as an at-will employee. As Plaintiff became insecure about his role and future with the Company, given his open rebellion and the mutinous behavior he was suborning, he made it known that he would like to have a written employment agreement that would, among other things, provide him certain assurances in the event his employment was terminated. He consistently complained – and explained that he felt stressed – because the CEO could fire him or he could quit, and he would have nothing to show for his time at Toptal beyond, possibly, two weeks of severance. From January 2017 through October 2018, Toptal agreed to advance Plaintiff certain monies for legal and other personal expenses related to the various civil and criminal cases involving Beneschott and the mother of his minor daughter, including a contentious paternity suit and custody battle. Plaintiff verbally agreed with Toptal that he would repay the amounts advanced to him, or paid by Toptal directly on his behalf, as a loan with interest at the minimum IRS rate. Toptal was led to believe this amount would be no more than about $70,000. Much to the Company's surprise, by summer 2018 the amounts that Beneschott had the Company pay on his behalf (by ordering his subordinates to pay

invoices that he presented for payment) exceeded $400,000, and, ultimately, totaled at least $424,819.60. In view of the size of this amount Toptal indicated a promissory note must be entered into and Beneschott and Toptal representatives began to perform a review of invoices and expenses to finalize a principal amount for a promissory note.  Nevertheless, as Plaintiff became more embroiled with the paternity suit and custody battle over his minor daughter, he resisted the formalization of a loan document for reasons he indicated were related to maintaining himself in an advantageous litigation position with regard to the paternity suit and child custody battle. Accordingly, Plaintiff resisted further moves toward finalizing a promissory note to repay the amounts advanced to him and on his behalf.  At all times, however, Plaintiff understood and acknowledged that these were amounts that were loans that needed to be repaid to Toptal.  Except as specifically admitted herein, the remaining averments of this paragraph are denied.

3.      The allegations of this paragraph are denied.  Answering further, Defendants never made any promises, representations, or agreements to provide Plaintiff any of the compensation alleged in the Complaint or any ownership stake in Toptal LLC.  There was no pretext for Plaintiff's termination, and the decision to terminate was not reached until the week before Plaintiff's termination. In fact, on or about July 12, 2018, Beneschott resigned his position and provided Toptal's CEO with two weeks' notice.  Beneschott was encouraged to rescind his decision and instead take a paid leave of absence to focus on his personal matters, and, accordingly, Beneschott informed Du Val on July 15, 2018, that he would take Toptal up on its offer to take a paid leave of absence and would plan to be away for about five weeks from mid-July to August 2018. When he returned to work in August 2018, he engaged in additional discussions regarding obtaining a written employment agreement with Toptal, which led to a meeting in early October 2018 in Naples, Florida, between Beneschott and Du Val.  The meeting in turn led to the

5

preparation of a draft employment agreement to be negotiated between the parties. It was while that employment agreement was being negotiated and the need for the parties to understand the nature and extent of Beneschott's personal expenses so that his promissory note could be finalized that Toptal discovered in early November 2018 that Beneschott had been deceptively causing Toptal to pay significant amounts of money to his girlfriend over the preceding eighteen or so months. This discovery came shortly after the start of a new Vice President of People on October 29, 2018, who, as part of her initial review of the Company' personnel configuration, uncovered the irregular and carefully concealed nature of payments that Beneschott was furtively directing to his girlfriend. What the Company uncovered was that starting in about April 2017 Beneschott had been presenting invoices totaling over $170,000 prepared by his girlfriend, Danielle Glickson, on the stationery of her interior design firm, LVD Spaces, for nondescript executive assistant "services rendered" and had directed individuals reporting to him to have those invoices paid. Beneschott knew that Du Val knew that Glickson was Beneschott's girlfriend but deceptively kept hidden the fact that his new "executive assistant" was in fact Glickson. Moreover, Beneschott never disclosed to his direct reports (whom Beneschott ordered to pay the invoices from LVD Spaces), that the "services" being "rendered" to him were being provided by his girlfriend. Beneschott used the invoicing from his girlfriend's interior design company, LVD Spaces, as a way to hide and disguise the fact that it was his live-in girlfriend whom Beneschott was having Toptal pay. Beneschott's "executive assistant" was never given a company e-mail address or a Slack account, and her name was kept off the list of the Company's employees and contract workers, further underscoring the sham nature of the arrangement and also indicating the extreme lengths to which Beneschott would go to conceal the fact that he was furtively and improperly directing money to his girlfriend. But, as the Company learned, Beneschott did not just improperly

direct money to his girlfriend. Toptal also discovered that in July 2018, Beneschott had directed subordinates to pay him a $10,000 bonus, intimating that the bonus had been approved by Toptal's CEO, when that in fact was not the case. The discovery of the payments to his girlfriend, supposedly for being his "executive assistant" and disguised as payments to a vendor, LVD Spaces, prompted an audit review and investigation of Beneschott's credit card charges, which, in turn, revealed that Beneschott was literally at that time on a Caribbean island getaway vacation in St. Maarten with his girlfriend having only recently used the company's credit card to pay for their airfare and hotel accommodation for the trip. In view of the highly disturbing and improper behavior uncovered, Plaintiff's at-will employment was terminated the day immediately following his return from this trip. There was no pretext. Rather, Beneschott was terminated as a result of highly improper and fraudulent behavior on his part that had caused significant monies to be misappropriated from Toptal as independently discovered by a new human resources executive within about a week of joining the Company on October 29, 2018. Toptal had ample grounds to terminate Plaintiff in view of his open and notorious insubordination, toxic contempt for the CEO to whom he reported, and ongoing efforts to oust the CEO, which would have resulted in his termination for cause from any other company. Nevertheless, it was not until Toptal discovered Plaintiff's improper and fraudulent attempt to supplement Plaintiff's own economic resources at the expense of his employer and convert company monies improperly for his own gain, that Toptal terminated Plaintiff's employment. During his termination meeting, Plaintiff admitted that he was wrong and conceded that he should have told Toptal that he had been having Toptal pay money to his girlfriend. Defendant denies the remaining averments of this paragraph.

      4.    Defendants deny the allegations in this paragraph. Answering further, Defendants never told Plaintiff he would be paid the same as the CEO of the Company. Defendants agree they

told Plaintiff he could repay the amounts advanced on his behalf, subject to the minimum IRS interest rate and other reasonable and customary terms that were to be reduced to writing in a promissory note. Except as specifically admitted herein, the remaining averments of this paragraph are denied.

5.     Defendants admit Plaintiff has attempted to set out such causes of action that are contained in the Complaint, but deny that any of them is meritorious.  Except as specifically admitted herein, the remaining averments of this paragraph are denied.

**PARTIES**

6.     Defendants admit that Plaintiff occupied the position of Chief Operating Officer during a period of time while he was employed by Toptal LLC.  Defendants deny Plaintiff performed duties commensurate with the position of Chief Operating Officer throughout the time he occupied that position.  Except as specifically admitted herein, the remaining averments of this paragraph are denied.

7.     The allegations of this paragraph are admitted.

8.     Defendants deny that Toptal has its principal address at 548 Market Street, #36879, San Francisco, California.  Except as specifically denied herein, the remaining averments of this paragraph are admitted.  Answering further, Defendant Toptal's principal address is 2810 N. Church Street #36879, Wilmington, Delaware.

9.     The allegations of this paragraph are denied.

**JURISDICTION AND VENUE**

10.     Defendants admit that jurisdiction over this matter exists in the United States District Court for the Middle District of Florida, Fort Myers Division.  Except as specifically admitted herein, the remaining averments of this paragraph are denied.

8

11.     The allegations of this paragraph are admitted.

12.     Defendants admit that Defendant Du Val presently resides in New York, New York, and Defendants deny the remaining allegations of this paragraph.

13.     The allegations of this paragraph are denied, as worded.

14.     Defendants admit that Du Val and Plaintiff met in Naples, Florida, in 2018, but denies the meeting took place in the summer and denies any portion of the meeting formed any basis for any of Plaintiff's purported causes of action.  Answering further, Defendants state the meeting took place in early October 2018.  This paragraph contains conclusions of law, to which no response is required. To the extent a response is required, Defendant denies the allegations in this paragraph, and, except as specifically admitted herein, the remaining averments of this paragraph are denied.

15.     Venue is proper in the United States District Court for the Middle District of Florida, Fort Myers Division.  The remaining allegations of this paragraph are denied.

16.     The allegations of this paragraph are denied.

## FACTUAL BACKGROUND

17.     Defendants are without sufficient information to admit or deny the allegations of this paragraph, and therefore deny the allegations of this paragraph.

18.     The allegations of this paragraph are denied, as worded.

19.     Defendants admit that Toptal was formed as a single-member limited liability company on October 29, 2010, but deny the remaining allegations of this paragraph.  Answering further, Defendants state that Toptal LLC was formed in Delaware on October 29, 2010, with Defendant Du Val as the single member.

20.     The allegations of the first two sentences of this paragraph are admitted.  The

9

remaining allegations of this paragraph are denied, as worded.

21.     Defendants admit that Plaintiff served as Toptal's Chief Operating Officer during a period of time while he was employed by Toptal LLC.  The remaining allegations of this paragraph are denied.  Answering further, Defendants categorically deny that Plaintiff ever was promised he would receive the same draw/salary and benefits as Du Val, and state that Plaintiff always was paid as an at will, W-2 employee of Toptal.  Answering further, Defendants note that Beneschott helped with the preparation of financial statements and materials for the Company's tax returns in his capacity as Toptal's Chief Operating Officer and was thus always aware of and knew Du Val's draw/salary and the other information he now alleges in his Complaint that he knew nothing about.

22.     The allegations of this paragraph are denied.  Answering further, Defendants respond that Plaintiff was terminated for cause.

23.     The allegations of this paragraph are denied.

24.     The allegations of this paragraph are denied. Answering further, Defendants respond that Plaintiff's shambolic and dysfunctional personal life continually interfered with and distracted him from his responsibilities toward Toptal leading to the need to take personal time away from his executive responsibilities.

25.     The allegations of this paragraph are denied.

26.     Defendants admit that Plaintiff was involved in a custody battle and that Toptal advanced well over $400,000 on Plaintiff's behalf.  The remaining allegations of this paragraph are denied.

27.     The allegations of this paragraph are denied.

28.     The allegations of this paragraph are denied.   Answering further, Defendants

respond that they are without knowledge as to Plaintiff's frame of mind but state that if Plaintiff was becoming concerned, it likely was because of his open and notorious hostility toward the CEO, his poor performance aggravated by the distractions of his personal life, and related behavior, as described above.

29.    The allegations of this paragraph are denied.

30.    The allegations of this paragraph are denied.  Answering further, Defendants respond that Plaintiff understood and had testified, as noted above, in Lee County Circuit Court that any possible future equity interest he might in fact get was in fact contingent and conditional upon certain events including a possible future conversion of Toptal LLC to a C-corporation. Plaintiff testified in court, under oath, he understood he would get nothing except "upon a conversion, which may or may not happen."   (Testimony of Breanden Beneschott given before the Lee County Circuit Court in the case styled *Senick v. Beneschott*, Case No. 17-DR-0559).

31.    The allegations of this paragraph are denied.

32.    The allegations of this paragraph are denied, except Defendants admit Plaintiff was terminated for cause on November 12, 2018.

33.    The allegations of this paragraph are denied.

### FIRST CLAIM FOR RELIEF
(*Breach of Oral Contracts*)

34.    Defendants incorporate by reference their responses to each and every allegation contained in paragraphs 1 through 33 of the Complaint, as if fully set forth herein.

35.    The allegations of this paragraph are denied.

36.    The allegations of this paragraph are denied.

37.    The allegations of this paragraph are denied.

38.    The allegations of this paragraph are denied.

11

## SECOND CLAIM FOR RELIEF
(*Fraud*)

39.     Defendants incorporate by reference their responses to each and every allegation contained in paragraphs 1 through 38 of the Complaint, inclusive, as fully set forth herein.

40.     The allegations of this paragraph are denied.  Answering further, Defendants note that Plaintiff knew that Toptal was a single-member LLC, of which Defendant Du Val was the single member, during the entire time of Plaintiff's employment by Toptal.  In his capacity as Toptal's Chief Operating Officer, Plaintiff frequently was involved in the review of the company's financial statements and was aware at all times of the ownership structure of Toptal LLC.

41.     The allegations of this paragraph are denied.

42.     The allegations of this paragraph are denied.

43.     The allegations of this paragraph are denied.

44.     The allegations of this paragraph are denied.

45.     The allegations of this paragraph are denied.

## THIRD CLAIM FOR RELIEF
(*Declaratory Judgment*)

46.     Defendants incorporate by reference their responses to each and every allegation contained in paragraphs 1 through 45 of the Complaint, inclusive, as fully set forth herein.

47.     The allegations of this paragraph are denied.

48.     Defendants admit Plaintiff is not entitled to anything and deny any remaining allegations in paragraph 48.

49.     Defendants admits that Toptal was formed as a single-member limited liability company and that Defendants dispute Plaintiff's contentions.  The remaining allegations of this paragraph are denied.

50.     Defendants admit that Plaintiff seeks certain relief but Defendants categorically deny that Plaintiff is entitled to any of the relief identified in this paragraph or the preceding paragraphs of this Complaint.

51.     The allegations of this paragraph are denied.

### FOURTH CLAIM FOR RELIEF
*(Claim for Wages, Attorneys' fees and costs, under Chapter 448, Florida Statutes)*

52.     Defendants incorporate by reference their responses to each and every allegation contained in paragraphs 1 through 51 of the Complaint inclusive, as fully set forth herein.

53.     The allegations of this paragraph are denied.

54.     Defendants admit that Plaintiff retained the attorneys whose signatures appear at the end of the Complaint in order to prosecute the claims included in the Complaint, and Defendants admit that Plaintiff seeks attorneys' fees and costs under § 448.08, Florida Statutes. Defendants deny categorically, however, that Plaintiff is entitled to any of the relief sought in the Complaint, including his attorneys' fees and costs including without limitation under § 448.08, Florida Statutes.

### FIFTH CLAIM FOR RELIEF
*(Claim for Quantum Meruit)*

55.     Defendants incorporate by reference their responses to each and every allegation contained in paragraphs 1 through 54 of the Complaint, inclusive, as fully set forth herein.

56.     The allegations of this paragraph are admitted.

57.     The allegations of this paragraph are denied.

58.     The allegations of this paragraph are denied.

59.     The allegations of this paragraph are denied.

60.     The allegations of this paragraph are denied.

## SIXTH CLAIM FOR RELIEF
### (*Claim for Promissory Estoppel*)

61.      Defendants incorporate by reference their responses to each and every allegation contained in paragraphs 1 through 60 of the Complaint, inclusive, as if fully set forth herein.

62.      The allegations of this paragraph are denied.

63.      The allegations of this paragraph are denied.

64.      The allegations of this paragraph are denied.

65.      The allegations of this paragraph are denied.

## AFFIRMATIVE DEFENSES

Defendants assert the following affirmative and other defenses without assuming any burdens of production, persuasion, or proof that, pursuant to law, are not legally assigned to Defendant and are Plaintiff's burden to prove.  Defendant further avers that Plaintiff's claims are so vague as to render it impossible to identify every possible affirmative or other defense, and thus expressly reserves its right to assert additional defenses should the precise nature of Plaintiff's claims become clear.

## FIRST AFFIRMATIVE DEFENSE

Defendants state that Plaintiff is liable to Defendants for their attorneys' fees and costs in defending this action under the authority of Fla. Stat. § 448.08.

## SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the applicable statutes of limitations.

## THIRD AFFIRMATIVE DEFENSE

Plaintiff's Complaint fails to state claims or causes of action for which relief may be granted.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims against Taso Du Val are barred by the business judgment rule.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the doctrines of laches and/or estoppel.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred in whole or in part by the doctrine of unclean hands.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's Complaint, and each and every cause of action therein, are barred by the doctrine of waiver.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's employment was at will, and no contractual obligations arose from it.

## NINTH AFFIRMATIVE DEFENSE

Plaintiff's contractual claims are barred by the statute of frauds.

## TENTH AFFIRMATIVE DEFENSE

Plaintiff's contractual claims are barred by the lack of mutual obligation.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred on the ground that as to each and every contractual relationship (oral, implied, or otherwise) alleged therein, there was a lack of consideration.

## TWELFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the doctrine of accord, satisfaction, and release.

## THIRTEENTH AFFIRMATIVE DEFENSE

No contract, implied or expressed, existed between the Defendants and Plaintiff.

## FOURTEENTH AFFIRMATIVE DEFENSE

Even assuming the existence of a contract, which Defendant denies, Defendant did not in any way materially breach the terms of such contract.

## FIFTEENTH AFFIRMATIVE DEFENSE

Neither Defendant made a promise to Plaintiff regarding his employment that it/he should reasonably have expected to induce action by Plaintiff.  Plaintiff did not reasonably rely upon statements/representations allegedly made by Defendant.   Nor is there the existence of circumstances such that justice can be achieved only by enforcement of an alleged promise.

## SIXTEENTH AFFIRMATIVE DEFENSE

There was no meeting of the minds with respect to the terms of the alleged contract.

## SEVENTEENTH AFFIRMATIVE DEFENSE

Should this Court find that Defendant and Plaintiff entered into a contract, Plaintiff materially breached the contract.

## EIGHTEENTH AFFIRMATIVE DEFENSE

Should this Court find that Defendant and Plaintiff entered into a contract, which Defendants do not concede, neither the alternative remedy of promissory estoppel nor the alternative remedy of quantum meruit is applicable.

## NINTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the doctrine of payment.  Plaintiff has been paid any monies or benefits allegedly owed.

## TWENTIETH-AFFIRMATIVE DEFENSE

Plaintiff's claims are barred or must be reduced by the doctrine(s) of set-off, offset, and/or recoupment.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

Plaintiff's breach of contract claim is barred by mutual mistake.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

Plaintiff's purported wage claims are limited to the two-year period provided for under Florida law prior to the date Plaintiff filed his Complaint.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

Plaintiff is not entitled to an award of punitive damages because the purported damages Plaintiff seeks sound in contract and may not therefore be used as the basis for an award of punitive damages under Plaintiff's purported fraud claim.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

Plaintiff has an obligation to mitigate his damages and has failed to do so.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

Without conceding Plaintiff has suffered any damages because of any alleged acts or omissions by Defendants, Plaintiff's alleged damages are limited or barred by the after-acquired evidence doctrine.

## TWENTY-SIXTH AFFIRMATIVE DEFENSE

Plaintiff has failed to properly plead a claim for fraud.

## TWENTY-SEVENTH AFFIRMATIVE DEFENSE

To the extent not otherwise pleaded, Defendant denies Plaintiff's allegations.

## JURY TRIAL DEMAND

Defendants admit that Plaintiff has demanded a trial by jury. Plaintiff is not entitled to a jury trial on his claims for declaratory relief, quantum meruit and promissory estoppel.

**WHEREFORE**, Defendants pray the Court award them their attorneys' fees and costs incurred in the defense of this action and dismiss Plaintiff's claims with prejudice.

## COUNTERCLAIM

Defendant/Counter-Plaintiff Toptal LLC, through its undersigned counsel, hereby files this Counterclaim against Plaintiff/ Counter-Defendant Breanden Beneschott. As alleged herein, Beneschott has breached his fiduciary duty to Toptal, breached his agreement to repay money he owes Toptal, has engaged in fraud and civil conspiracy, and has caused the embezzlement of significant funds from Toptal.

## GENERAL ALLEGATIONS

1.      This Court has jurisdiction over this Counterclaim, as it has jurisdiction over Plaintiff Beneschott's original claims in this action:  pursuant to 28 U.S.C. § 1332, there is diversity between the parties and the amount in controversy exceeds $75,000

2.      Toptal is a single-member Delaware limited liability company, of which Taso Du Val is the single member.

3.      Toptal's principal address is 2810 N. Church Street #36879, Wilmington, Delaware.

4.      Toptal is a United States-based global company that curates a proprietary talent network of select, highly-skilled independent contractors and sources and makes available such talent to its clients in the United States and globally.

5.      Taso Du Val is a citizen and resident of New York, New York, and is the Chief Executive Officer of Toptal.

6.      Upon information and belief, Beneschott is a citizen of the State of Florida and a resident of Collier County, Florida.

18

**FACTUAL OVERVIEW**

7.     Toptal terminated Beneschott's at-will employment for the reasons discussed herein on November 12, 2018.  Toptal reluctantly reached this decision once it uncovered the way and extent to which Beneschott had caused significant funds to be embezzled from Toptal, had defrauded Toptal by improperly diverting more than $170,000 to his live-in girlfriend, had breached his fiduciary duty and betrayed the trust, confidence and authority invested in him in his capacity as Toptal's Chief Operating Officer, and had been improperly using his company credit card for purely personal expenses, including paying for a Caribbean island vacation with his girlfriend, all as further explained below and herein.

8.     Taso Du Val founded what became Toptal, LLC on July 26, 2010, having multiple clients, registering the Toptal.com website, and signing contracts with several clients, one of whom was Beneschott.  Du Val formed Toptal, LLC on October 29, 2010.  As the Toptal business continued to flourish, in mid-November 2010, Du Val reached out to Beneschott and asked him if he would be willing to help him out and hired Beneschott on or about November 16, 2010, as Toptal's first employee, to be its Chief Operating Officer ("COO").  Du Val instructed Beneschott to introduce himself to prospective clients as Toptal's COO or something that sounded like it would resonate well with clients.

9.     As COO, Beneschott reported directly to Du Val, the CEO of Toptal.

10.     Beneschott always was paid as an at will, W-2 employee of Toptal.

11.     Over the years, Beneschott became unsatisfied that his deal with Toptal, LLC was that of a mere at-will employee with no equity stake because, with the benefit of hindsight and Toptal's success, he came not to like it, but, as COO, Beneschott understood what the nature of his employment and compensation relationship with Toptal were.

12.     In 2016 and 2017, Beneschott brought to Toptal's attention that he was involved in multiple civil and criminal cases in the State of Florida involving him and the mother of his minor daughter, including a contested paternity suit and child custody battle for his minor daughter pending in the Circuit Court in and for Lee County, Florida, styled *Senick v. Beneschott*, Case No. 17-DR-0559.

13.     Beneschott expressed concerns to Toptal that the mother of his daughter was trying to position him as a tech company multi-millionaire and was using Beneschott's self-aggrandizing media coverage and social media presence to his disadvantage.

14.     Accordingly, Beneschott had his personal attorneys contact Toptal because Beneschott and his attorneys were at pains to counter the mother's portrayal of Beneschott and wanted to substantiate that, despite colloquial references to him as a "co-founder," he was merely a salaried at-will employee of Toptal with no equity stake in Toptal, LLC.

15.     At the request of Beneschott and that of his personal attorney, Toptal's outside law firm provided a letter to Beneschott's personal attorney, dated September 17, 2018, stating "Mr. Beneschott is an employee of Toptal, LLC, which is a privately-held, single member LLC.  Mr. Beneschott is not a member, shareholder, or owner of the company."

16.     To assist with the preparation of such letter, on August 3, 2018, Beneschott's counsel in his paternity suit and custody battle provided to Defendants excerpts of Beneschott's sworn in-court testimony before the Lee County Circuit Court to substantiate Beneschott's understanding that he had no equity interest in Toptal, LLC.  Beneschott testified as follows:

Q:  What is the structure of the company?  Is it a corporation?

A:  It's a single-member LLC, of which I am not the single member.

Q:  Okay.  And so you're a shareholder?

A:  Technically no.

…

Q:  Who is the single member?

A:  Taso Du Val.

…

Q:  At this moment, you don't actually own 17 percent of this company, it's owned by one person?

A: That's correct.

Q: Who's not you?

A: Correct.

(Testimony of Breanden Beneschott given before the Lee County Circuit Court in the case styled *Senick v. Beneschott*, Case No. 17-DR-0559).

17.    Beneschott understood and indeed testified, as noted above, under oath, in the same hearing before the Lee County Circuit Court that he had no equity stake in Toptal, LLC and that he might be entitled at some point in the future to an equity interest but that was in fact contingent and conditional upon certain events including a possible future conversion of Toptal, LLC to a C-corporation.  As he testified in court, under oath, Beneschott understood he would get nothing except "upon a conversion, which may or may not happen."  (Testimony of Breanden Beneschott given before the Lee County Circuit Court in the case styled *Senick v. Beneschott*, Case No. 17-DR-0559).

18.    From January 2017 through October 2018, Toptal agreed to advance Beneschott certain monies for legal and other personal expenses related to the various civil and criminal cases

involving Beneschott and the mother of his minor daughter, including a contentious paternity suit and custody battle.

19.    Beneschott verbally agreed with Toptal that he would repay the amounts advanced to him, or paid by Toptal directly on his behalf, as a loan with interest at the minimum IRS rate. Toptal was led to believe this amount would be no more than about $70,000.

20.    Much to the company's surprise, by summer 2018, the amounts that Beneschott had the Company pay on his behalf (by ordering his subordinates to pay invoices that he presented for payment) exceeded $400,000, and, ultimately, totaled at least $424,819.60.

21.    In view of the size of this amount, Toptal indicated a promissory note must be entered into and Beneschott and Toptal's representatives began to perform a review of invoices and expenses to finalize a principal amount for a promissory note.

22.    Nevertheless, as Beneschott became more embroiled with the paternity suit and custody battle over his minor daughter, he resisted the formalization of a loan document for reasons he indicated were related to maintaining himself in an advantageous litigation position with regard to the paternity suit and child custody battle.

23.    Accordingly, Beneschott resisted further moves toward finalizing a promissory note to repay the amounts advanced to him and on his behalf.

24.    At all times, however, Beneschott understood and acknowledged that these were amounts that were loans that needed to be repaid to Toptal. He testified in court in the case styled *Senick v. Beneschott*, Case No. 17-DR-0559, in Circuit Court in Lee County, Florida, as follows:

Q:  Is there a promissory note? Anything in writing indicating you owe the money?

A:  There's not a promissory note.  Determined it wasn't necessarily needed given

      that deep in audits and everything else that this is very clearly right there. …

Q:  And so how is this different than continuing to take draws from your income

that you don't want to pay taxes on? …

A:  I have to pay all this back.

25.     In 2017, Beneschott convinced Toptal that he should secure the services of an

executive assistant to assist him with administrative needs.

26.     Beneschott furtively retained the services of his interior designer girlfriend,

Danielle Glickson, purportedly to serve as his executive assistant, characterizing the arrangement

as one in which he claimed he would be securing executive assistant services intermittently on a

contract basis.

27.     Beneschott presented invoices prepared by Glickson on the stationery of her interior

design firm, LVD Spaces, and directed individuals reporting to him to have those invoices paid.

Beneschott knew that Du Val knew that Glickson was Beneschott's girlfriend but deceptively kept

hidden the fact that his new "executive assistant" was in fact Glickson, his girlfriend, because Du

Val, as Toptal's CEO and his supervisor, would have had to approve any such arrangement.

28.     Simultaneously, Beneschott never disclosed to his direct reports (whom Beneschott

ordered to pay the invoices from LVD Spaces) that the "services" being "rendered" to Beneschott

were being provided by his girlfriend.

29.     Beneschott used the invoicing from his girlfriend's interior design company, LVD

Spaces, as a way to hide and disguise the fact that it was his live-in girlfriend whom Beneschott

was having Toptal pay.

30.     Beneschott's "executive assistant" was never given a company e-mail address or a

Slack account, and her name was kept off the list of the Company's employees and contract

workers, further underscoring the sham nature of the arrangement and also indicating the extreme

lengths to which Beneschott would go to conceal the fact that he was improperly diverting money to his girlfriend.  Moreover, with no company email or Slack account, and given the virtual, fully distributed nature of Toptal as a remote-only company, Glickson did not interact with members of Toptal's executive team on a professional basis, and indeed could not do so in any way commensurate with her supposed status as the "executive assistant" of Toptal's COO.

31.     This stratagem was part of an elaborate scheme on the part of Beneschott to illegitimately supplement his own income and convert Toptal monies to his own personal use to support his and his girlfriend's lifestyle and standard of living.

32.     In early November 2018, Toptal discovered that Beneschott had been deceptively causing Toptal to pay significant amounts of money to his girlfriend over the preceding eighteen or so months. This discovery came shortly after the start of a new Vice President of People on October 29, 2018, who, as part of her initial review of the Company's personnel configuration, uncovered the irregular and carefully concealed nature of the payments that Beneschott was furtively directing to his girlfriend.

33.     Beneschott's arrangements involving his girlfriend constituted the proverbial "sweetheart deal," as it resulted in payments to her by Toptal as a purported executive assistant at far-above-market rates for duties for which, as an interior designer, she was unqualified.

34.     By resorting to this elaborate scheme, Beneschott defrauded Toptal into paying his girlfriend a total of at least $170,775.00, excluding purported expense reimbursements, over nineteen months.

35.     At all times, Beneschott knew and understood that what he was doing with respect to having Toptal pay his girlfriend's invoices for "services" supposedly "rendered" to him was wrong, as he himself acknowledged during his termination meeting on November 12, 2018.

36.    Throughout 2017 and 2018, Beneschott misused his Toptal credit card to pay for $17,340.58 of personal expenses and denied or tried to hide that those charges, including a Caribbean vacation trip for himself and his girlfriend, were of a personal nature.

37.    In 2017 and 2018, Beneschott also misused his Toptal credit card to pay $6,915.28 for his girlfriend's airfare to various destinations for no legitimate company purpose.

38.    On or about November 5, 2018, in connection with Toptal's attempt to determine the principal amount of the promissory note that would be used to document the amounts advanced to or paid on behalf of Beneschott, as discussed above, Beneschott falsely stated to Toptal that all of the expenses charged to his Toptal credit card were for business, except as otherwise previously disclosed by him to Toptal.

39.    Even then, when given an opportunity to come clean and admit his misappropriation of Toptal's funds, Beneschott continued to hide his misuse of the company's credit card for his personal gain, for instance, by conveniently not reporting that he had paid for an upcoming Caribbean vacation later that very week for himself and his girlfriend.

40.    In fact, Toptal discovered that Beneschott had used his company credit card on October 18, 2018, to purchase airline tickets to St. Maarten and hotel accommodations for himself and his girlfriend for a trip from Wednesday, November 7 to Sunday, November 11, 2018.

41.    Toptal also discovered that in July 2018, Beneschott had directed subordinates to pay him a $10,000 bonus, intimating that the bonus had been approved by Toptal's CEO, when that in fact was not the case.

42.    Upon Toptal's discovery of Beneschott's abuse of authority and diversion of funds, as described above, Toptal terminated Beneschott's at-will employment with Toptal on Monday, November 12, 2018, immediately following his return from St. Maarten.

43.    During his termination meeting, Beneschott admitted that he was wrong and agreed that he "should have told someone" at Toptal that he had been having Toptal pay money to his girlfriend.

44.    The expenses incurred and described in paragraphs 26-44 were incurred without permission from or approval, as they should have been, by Du Val in his capacity as CEO and Beneschott's direct supervisor, and were never ratified, condoned or approved by Du Val after they were incurred.

45.    All told, the amounts (i) advanced by, and directly paid on Beneschott's behalf, by Toptal, (ii) of personal expenses charged by Beneschott on his company credit card, (iii) that Beneschott had Toptal pay his girlfriend, and (iv) of his unapproved "bonus," totaled at least $629,850.46.

46.    On July 3, 2019, Beneschott wired $466,373.67 to Toptal.

47.    This wire payment was made to Toptal out of the blue with no prior indication that it was forthcoming, and Beneschott has never provided an explanation for, or accounting of, the payment.

48.    As noted above, Beneschott had grown dissatisfied that his employment terms with Toptal, LLC were those of an  at-will employee with no equity stake, but he also understood his employment and compensation arrangements as a salaried, at will employee, even if he came not to like them.

49.    In his capacity as Toptal's Chief Operating Officer, Beneschott frequently was involved in the review of the company's financial statements and was aware at all times of the ownership structure of Toptal, LLC.

50.    Over the course of 2017 and 2018, Beneschott attempted to recruit and enlist Toptal employees and others in efforts to marginalize, undermine the authority of, and ultimately oust Du Val as CEO of Toptal.

51.    In whole or large part, Beneschott's contempt toward Du Val appeared to stem from Beneschott's resentment and frustration that he had not negotiated a better deal with Toptal than his role as an at-will employee.  At the same time, Beneschott increasingly became more vocal with colleagues and subordinates, openly stating that he should be the CEO of Toptal and that, in his view the only thing wrong with Toptal was its CEO.

52.    In addition, Beneschott's efforts to remove Du Val as Toptal's CEO were becoming more urgent to the extent that Du Val was the one person at Toptal that could hold Beneschott to account for his extensive pattern of fraud and deception, as noted above.

53.    For instance, Beneschott informed the Company's new Vice President of People, even before she joined Toptal on October 29, 2018, that:  (i) he felt there needed to be a change at the top at Toptal; (ii) it would, in his opinion, be in the Company's best interests if Du Val left Toptal; (iii) there was a group of executives who agreed with Beneschott and had tried to force the issue at the Company's recent executive offsite meeting in Cancun, Mexico in late April/early May 2018; and (iv) Beneschott hoped and expected that she, as the incoming VP of People, could facilitate the process of removing Du Val from his position as CEO.  Otherwise, Beneschott informed the new VP of People, he would be left with no choice but to leave Toptal.

54.    Beneschott's open animosity and contempt for Toptal's CEO were noted in rambling and disturbing peer performance reviews submitted in October 2018, which revealed more about Beneschott than those he was reviewing, in which he rated the CEO and the other

executives who Beneschott perceived were not sufficiently receptive to his mutinous overtures, with scores in multiple categories that Toptal only reserves for people who should be terminated.

55.     As Beneschott became insecure about his role and future with the Company, given his open rebellion and the mutinous behavior he was suborning, he made it known that he would like to have a written employment agreement that would, among other things, provide him certain assurances in the event his employment was terminated.

56.     Beneschott constantly complained – and explained that he felt stressed – because he understood that as an at-will employee the CEO could fire him or he could quit, and he would have nothing to show for his time at Toptal beyond, possibly, two weeks of severance.

57.     In fact, on or about July 12, 2018, Beneschott resigned his position and provided Toptal's CEO with two weeks' notice.  Beneschott was encouraged to rescind his decision and instead take a paid leave of absence to focus on his personal problems.

58.     Accordingly, Beneschott informed Du Val on July 15, 2018, that he would take Toptal up on its offer to take a paid leave of absence and would plan to be away for about five weeks from mid-July to August 2018.

59.     When Beneschott returned to work in August 2018, he engaged in additional discussions regarding obtaining a written employment agreement with Toptal, which led to a meeting in early October 2018 in Naples, Florida, between Beneschott and Du Val.

60.     The meeting in turn led to the preparation of a draft employment agreement to be negotiated between the parties.

61.     Indeed, it was while that employment agreement was being negotiated and the need for the parties to understand the nature and extent of Beneschott's personal expenses so that his promissory note could be finalized that Toptal discovered in early November 2018 that Beneschott

had been deceptively causing Toptal to pay significant amounts of money to his girlfriend over the preceding eighteen or so months.

62.   The parties never executed an employment agreement.

63.   After the termination of Beneschott's at-will employment, Beneschott, as part of a way to extract even more money from Toptal and continue to unjustly enrich himself at Toptal's expense, has made baseless and unfounded claims to Toptal that, prior to the formation of Toptal, LLC, he was promised a 17% stake in Toptal, LLC.

64.   Also after the termination of Beneschott's at-will employment, again to extract even more money from Toptal and continue to unjustly enrich himself at Toptal's expense, Beneschott has also made baseless and unfounded claims, that he is entitled to $2 million in severance, the monetary equivalent of a two-month leave of absence, and a $40,000 bonus.

65.   No basis exists for any claim by Beneschott to an interest in Toptal, LLC or to any severance, leave of absence, or bonus. On the contrary, Beneschott's at-will employment was terminated for the reasons herein explained, and Beneschott left Toptal's employ unjustly enriched, and with amounts owed by him to Toptal in the form of unpaid loan amounts, unreimbursed credit card charges of a purely personal nature, and restitution for amounts caused to be embezzled and diverted to his girlfriend and for an unapproved, self-awarded bonus, totaling at least $629,850.46.

## COUNT I:  FRAUD

66.   Toptal incorporates by reference, as if fully restated herein, the allegations in paragraphs 1-65 of the Complaint.

67.   Beneschott informed Toptal that he needed an executive assistant, with the intent to have Toptal pay money to his girlfriend for little or no work.

68.    Accordingly, Beneschott contracted with his girlfriend through her interior design company to provide "services" to him as an "executive assistant."

69.    The sham nature of this arrangement was evidenced in part by his failure to have her obtain a company e-mail address or Slack account and taking steps he knew would cause her to be not included on the Company's list of employees and contract workers by presenting the arrangement to his direct reports as one that would require only intermittent services to him and paying her as a vendor under his girlfriend's interior design company so those payments would be disguised and listed as payments to the nondescript vendor, LVD Spaces.

70.    Indeed, Beneschott had his girlfriend submit invoices to him under her interior design company, LVD Spaces, for nondescript "services rendered."

71.    Beneschott in turn would submit those invoices to his direct reports, ordering them to be paid, and took steps to hide the arrangement from his supervisor, Toptal's CEO, and other executive officers, because he knew that they knew that Glickson was his girlfriend and would call into question the size and nature of the payments to his girlfriend.

72.    In particular, Beneschott went to the elaborate steps noted above to hide and disguise the fact that the payments he was ordering to made for the invoices he submitted from LVD Spaces were amounts that would be paid to his girlfriend because he knew that his subordinates in finance and accounts payable would question the appropriateness of the payments and report the arrangement to Du Val.

73.    At the time Beneschott retained the "services" of his girlfriend as a contractor, he did so with an intent to deceive and deprive the company of resources, as he knew his girlfriend, an interior designer, would perform little, if any, work for Toptal, and could not do so without a company e-mail address or Slack account, given the virtual distribution of Toptal as a remote-only

company, and would have Toptal pay his girlfriend exorbitant rates well above any conceivable market rate for that role—a true "sweetheart deal."

74.    Beneschott intended Toptal to rely on his false representation regarding Glickson in order to cause Toptal's accounts payable department to pay Glickson for purported work at well above-market rates.

75.    At all times, Beneschott knew and understood that what he was doing with respect to having Toptal pay his girlfriend's invoices for "services" supposedly "rendered" to him was wrong, as he himself acknowledged during his termination meeting on November 12, 2018.

76.    In reliance on the false representations by Beneschott, Toptal paid Glickson, Beneschott's live-in girlfriend, excessive amounts of money for little, if any, work – at least not for Toptal's benefit.

77.    In addition, Beneschott directed his subordinate to pay him a $10,000 bonus, intimating that this had been approved by Toptal's CEO, when that in fact was not the case

78.    Toptal has been damaged and defrauded of a significant amount of money, as described above, by Beneschott's intentionally deceptive and false representations.

**WHEREFORE**, Toptal respectfully requests the Court:

(i)     Enter judgment in favor of Toptal and against Beneschott.

(ii)    Award Toptal restitution.

(iii)   Award Toptal prejudgment interest.

(iv)    Award Toptal its costs in bringing this action.

(v)     Award Toptal general, consequential, and special damages in accordance with proof at trial.

(vi)    Award Toptal such other and further relief as the Court deems just and proper.

## COUNT II:  BREACH OF FIDUCIARY DUTY

79.    Toptal incorporates by reference, as if fully restated herein, the allegations in paragraphs 1-65 of the Complaint.

80.    Toptal and Beneschott shared a relationship whereby Toptal reposed trust and confidence in Beneschott as its Chief Operating Officer, and Beneschott consented to this relationship, undertook such trust, and assumed a duty to advise, counsel, and/or protect Toptal.

81.    By the actions described above and herein, Beneschott breached his fiduciary duty to Toptal and betrayed the trust, confidence and authority invested in him in his capacity as Toptal's Chief Operating Officer, and caused significant damages to Toptal by:

(i)    improperly diverting company funds for personal use by himself and his girlfriend, and abusing his position of trust, responsibility, and authority in directing his subordinates to pay Glickson's sham invoices for "services rendered" that were submitted as invoices from "LVD Spaces" to conceal the true nature of the payments as payments to his girlfriend and to ensure that her name didn't appear on the list of the Company's employees and contract workers – a list Beneschott knew Du Val consulted and reviewed regularly and where it was sure to be discerned by Du Val;

(ii)    taking advantage of – indeed abusing – Toptal's willingness to pay invoices of a personal nature totaling more than $400,000, directing his subordinates to pay any invoice he submitted to them;

(iii)    when confronted with the need to memorialize in writing the repayment of such large amounts in a promissory note, agreeing and then refusing to do so in order to seek a perceived advantage in his ongoing paternity suit and child custody battle,

32

(iv)    directing a subordinate to pay him a $10,000 bonus, intimating that that had been approved by the Company's CEO, when in fact that was not true; and

(v)    engaging in a campaign to oust the CEO of Toptal.

**WHEREFORE**, Toptal respectfully requests the Court:

(i)    Enter judgment in favor of Toptal and against Beneschott.

(ii)    Award Toptal restitution.

(iii)    Award Toptal prejudgment interest.

(iv)    Award Toptal its costs in bringing this action.

(v)    Award Toptal general, consequential, and special damages in accordance with proof at trial.

(vi)    Award Toptal such other and further relief as the Court deems just and proper.

## COUNT III:  BREACH OF ORAL AGREEMENT

82.    Toptal incorporates by reference, as if fully restated herein, the allegations in paragraphs 1-65 of the Complaint.

83.    In 2018, Beneschott verbally agreed to sign a promissory note requiring him to pay back the extensive loan he had taken, and was continuing to take, from Toptal, with the minimum IRS interest rate.

84.    Beneschott would not agree to finalize and sign a promissory note reflecting the specific payments he agreed to make, as he indicated it would be advantageous to him not to have to produce the document in the context of his paternity suit and custody battle with the mother of his minor daughter.

85.    Beneschott has breached his oral agreement to sign a promissory note and to repay the loan with interest.

33

86.    Toptal acknowledges it has received some money from Beneschott, but with no accounting or explanation from him, it is not clear if that amount is meant to be restitution for the amounts he acknowledged at his termination meeting that he wrongfully caused to be paid to his girlfriend, or the amounts he wrongfully had paid to him as an unapproved bonus, or toward what would have been the principal amount of the promissory note, or reimbursements for the personal use of his company credit card.

**WHEREFORE**, Toptal respectfully requests the Court:

(i)    Enter judgment in favor of Toptal and against Beneschott.

(ii)    Award Toptal restitution.

(iii)    Award Toptal prejudgment interest.

(iv)    Award Toptal its costs in bringing this action.

(v)    Award Toptal general, consequential, and special damages in accordance with proof at trial.

(vi)    Award Toptal such other and further relief as the Court deems just and proper.

## COUNT IV:  CIVIL CONSPIRACY

87.    Toptal incorporates by reference, as if fully restated herein, the allegations in paragraphs 1-65 of the Complaint.

88.    Beneschott conspired with Glickson to arrange the above-described "sweetheart deal" whereby Glickson, through her interior design firm, LVD Spaces, submitted invoices to Beneschott for nondescript "services rendered."  Beneschott, in turn, abused his position of trust, responsibility, and authority and directed his subordinates to pay Glickson's invoices.  The scheme netted them and deprived Toptal of more than $170,000, in exchange for little, if any, work, at least not for Toptal's benefit.

89.     The result of these acts done in furtherance of the civil conspiracy is that Beneschott defrauded and caused the embezzlement of significant funds from Toptal, and Toptal has been damaged as described herein.

**WHEREFORE**, Toptal respectfully requests the Court:

(i)     Enter judgment in favor of Toptal and against Beneschott.

(ii)    Award Toptal restitution.

(iii)   Award Toptal prejudgment interest.

(iv)    Award Toptal its costs in bringing this action.

(v)     Award Toptal general, consequential, and special damages in accordance with proof at trial.

(vi)    Award Toptal such other and further relief as the Court deems just and proper.

## COUNT V:  UNJUST ENRICHMENT

90.     Toptal incorporates by reference, as if fully restated herein, the allegations in paragraphs 1-65 of the Complaint.

91.     By means of the intentionally deceptive schemes described above, Beneschott defrauded and improperly extracted from Toptal significant monetary benefits for himself, including:

(i)     low-interest advances and payments of personal invoices for Beneschott's personal expenses and legal fees in amounts that greatly exceeded what Toptal had contemplated;

(ii)    payments for sham "services rendered" to Beneschott's live-in girlfriend, which were of indirect, if not direct, benefit to Beneschott, in helping him support his lifestyle and standard of living; and

(iii)    the payment by Toptal of Beneschott's purely personal expenses such as a Caribbean island vacation with his girlfriend.

92.    Beneschott is and was well aware of all of these benefits, and indeed took calculated steps to conceal his receipt of such benefits from Toptal, as noted above.

93.    At all times, Beneschott knew and understood that what he was doing with respect to having Toptal pay his girlfriend's invoices for "services" supposedly "rendered" to him was wrong, as he himself acknowledged during his termination meeting on November 12, 2018

94.    In addition to the foregoing, Beneschott also schemed and betrayed his position of trust, responsibility and authority to have a $10,000 bonus payment made to himself that was not approved by Du Val.

95.    Beneschott voluntarily accepted and retained the foregoing benefits and compensation.

96.    It would be inequitable for Beneschott to retain the value of such benefits and equity and justice demand that Beneschott be compelled to repay Toptal for the value of such ill-gotten gains.

**WHEREFORE**, Toptal respectfully requests the Court:

(i)    Enter judgment in favor of Toptal and against Beneschott.

(ii)    Award Toptal restitution.

(iii)    Award Toptal prejudgment interest.

(iv)    Award Toptal its costs in bringing this action.

(v)    Award Toptal general, consequential, and special damages in accordance with proof at trial.

(vi)    Award Toptal such other and further relief as the Court deems just and proper.

## COUNT VI:  PROMISSORY ESTOPPEL

97.    Toptal incorporates by reference, as if fully restated herein, the allegations in paragraphs 1-65 of the Complaint.

98.    Beneschott promised to repay the loan and the advances Toptal made to him, with interest.

99.    Beneschott deliberately misrepresented the nature of personal expenses charged to his company credit card in the hope and expectation that he would not thereby have to repay Toptal and could therefore get away with a brazen personal misuse of his company credit card.

100.    Toptal relied on the promises and representations Beneschott made to its detriment and has suffered harm as a result.

**WHEREFORE**, Toptal respectfully requests the Court:

(i)     Enter judgment in favor of Toptal and against Beneschott.

(ii)    Award Toptal restitution.

(iii)   Award Toptal prejudgment interest.

(iv)    Award Toptal its costs in bringing this action.

(v)     Award Toptal general, consequential, and special damages in accordance with proof at trial.

(vi)    Award Toptal such other and further relief as the Court deems just and proper.

## COUNT VII:  CONVERSION

101.    Toptal incorporates by reference, as if fully restated herein, the allegations in paragraphs 1-65 of the Complaint.

102.    The unauthorized acts of Beneschott described above constituted outright theft of Toptal's money and property.

103.    The deprivation occasioned by the theft is inconsistent with Toptal's ownership interest in the money and property stolen.

104.    Toptal has suffered, and continues to suffer, damages as a direct and proximate result of this theft.

**WHEREFORE**, Toptal respectfully requests the Court:

(i)    Enter judgment in favor of Toptal and against Beneschott.

(ii)    Award Toptal restitution.

(iii)    Award Toptal prejudgment interest.

(iv)    Award Toptal its costs in bringing this action.

(v)    Award Toptal general, consequential, and special damages in accordance with proof at trial.

(vi)    Award Toptal such other and further relief as the Court deems just and proper.

## COUNT VIII:  DECLARATORY JUDGMENT

105.    Toptal incorporates by reference, as if fully restated herein, the allegations in paragraphs 1-65 of the Complaint.

106.     Beneschott was an at-will employee of Toptal, LLC, with no employment contract and no equity stake in Toptal, LLC.

107.    Beneschott claims he is entitled to the items set forth in paragraphs 63 and 64, above.  Toptal asserts that Beneschott is not entitled to the compensation and benefits set forth in paragraphs 63 and 64.

108.    An actual controversy has arisen and now exists between Toptal and Beneschott concerning their respective rights and obligations.

109.    Toptal seeks a judicial determination of the parties' respective rights and obligations and a declaration that Beneschott is not entitled to any of the items set forth in paragraphs 63 and 64, above.

110.    A judicial determination is necessary and appropriate at this time under the circumstances.

**WHEREFORE**, Toptal respectfully requests the Court:

a.    Enter judgment in favor of Toptal and against Beneschott.

b.    Award Toptal its costs in this action.

c.    Declare that Beneschott is not entitled to any equity stake in Toptal, LLC, nor is he entitled to any additional compensation from Toptal, LLC of any sort.

d.    Award Toptal such other and further relief as the Court deems just and proper.

Respectfully submitted,

*/s/Peter W. Zinober*
Peter W. Zinober, Esquire
Florida Bar No.:  121750
Lara J. Peppard
Florida Bar No. 520055
OGLETREE, DEAKINS, NASH
    SMOAK & STEWART P.C.
100 North Tampa Street, Suite 3600
Tampa, Florida 33602
Telephone: 813.289.1247
Facsimile: 813.289.6530
Email: peter.zinober@ogletree.com
Secondary Email:  angela.curvelo@ogletree.com
Secondary Email:  TamDocketing@ogletree.com
*Attorneys for Taso Du Val and Toptal, LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 16, 2019, a true and correct copy of the foregoing

has been furnished via electronic mail upon counsel of record as follows:

Anne Marie Estevez
FBN: 991694
Martha Leibell
FBN: 106990
MORGAN, LEWIS & BOCKIUS LLP
200 South Biscayne Boulevard, Suite 5300
Miami, FL 33131
*Attorneys for Breanden Beneschott*

                    /s/Peter W. Zinober
                    Attorney